OPINION OF THE COURT
Rosenblatt, J.
RPAPL article 7-A provides a legal means of remedying dangerous conditions in multi-dwelling apartment buildings. When a court determines that a dangerous condition exists, it is authorized to appoint an Administrator to oversee rehabilitation of the building. The 7-A Administrator can borrow money from the New York City Housing Preservation and Development Agency to finance the repairs. Under the statutory scheme, the City is able to secure these loans with liens *471 against benefitted buildings. In this case, we must determine whether the City created liens enforceable against plaintiff, the building owner.
The subject property is a 26-unit residential apartment building in the Bronx. In May 1991, Civil Court found that a dangerous condition existed and appointed a 7-A Administrator. The Administrator applied to HPD’s 7-A Assistance Unit for a loan to rehabilitate the building, and after an inspection of the premises, HPD approved a $160,000 loan in August 1991. HPD made the loan in increments but did not file in its public record any purchase or work orders in connection with the loan. The work was completed by February 1993. In the interim, ownership of the property changed after a foreclosure sale.
The new owner, Symcam Ltd., held, the building until it filed for chapter 7 bankruptcy. The trustee then put the premises up for sale. In July 1993, plaintiff learned that the building was on the market. He obtained a title report, which contained nothing regarding the 7-A loan. In August 1993, plaintiff bought the building for $5,000.
In May 1994, HPD filed a statement of account with the city collector for the $160,000 7-A loan. The city collector then asserted liens against the building in that amount. Plaintiff commenced this action to discharge the liens, claiming they were void. He also sought damages. Plaintiff argued that when he bought the building, the liens had not yet been created and therefore he could not have taken title subject to them. He moved for summary judgment on the cause of action seeking discharge of the liens, which Supreme Court granted. The Appellate Division modified, holding that there was a triable issue of fact as to plaintiff’s pre-purchase knowledge of HPD’s involvement in repairs to the premises. According to the majority, had plaintiff known about the 7-A loans, he could not have been a good-faith purchaser and would have taken title subject to the then-existing liens arising out of the 7-A loans to the Administrator. Two Justices dissented, asserting that the liens did not come into existence until after plaintiff purchased the property and he therefore took title free and clear. We now reverse, although our analysis differs from that of the dissenting Justices.
Under article 7-A, one-third of the tenants in a given building or the Commissioner of HPD can bring a special proceeding against an owner of a multi-dwelling apartment building alleging the existence of a dangerous condition (RPAPL 770). Upon *472 finding that a condition “dangerous to life, health or safety” exists, a Judge can appoint a 7-A Administrator who, in essence, becomes responsible for rehabilitating the building (RPAPL 776). Subject to the court’s direction, the 7-A Administrator is empowered to order “the necessary materials, labor and services to remove or remedy the [dangerous] conditions,” demand, collect and receive rents from the tenants, institute all necessary legal proceedings and rent or lease space in the building (RPAPL 778).
Section 778 further authorizes the 7-A Administrator to borrow money from HPD “for the purpose of replacing or substantially rehabilitating systems or making other repairs or capital improvements” (RPAPL 778). Under section 778, “[a] 11 moneys expended by [HPD] * * * shall constitute a debt recoverable from the owner and a lien upon the building and lot, and upon the rents and other income thereof.” Critically, the statute provides that “[s]uch lien shall be enforced in accordance with the provisions of article eight of subchapter five of the [New York City] housing maintenance code” (RPAPL 778).
Article eight, subchapter five, section 27-2144 of the Housing Maintenance Code sets forth the procedure for creating 7-A liens against premises and the extent to which those liens are enforceable. Subdivision (b) provides that
“[a] 11 expenses incurred by [HPD] for the repair or the elimination of any dangerous or unlawful conditions therein * * * shall constitute a lien upon the premises when the amount thereof shall have been definitely computed as a statement of account by [HPD] and [HPD] shall cause to be filed in the office of the city collector an entry of the account stated in the book in which such charges against the premises are to be entered” (Administrative Code of City of NY § 27-2144 [b] [emphasis added]).
Subdivision (b) further provides, however, that “no lien created pursuant to this chapter shall be enforced against a subsequent purchaser in good faith * * * unless the requirements of subdivision a * * * are satisfied.” Subdivision (á) requires that HPD file in its own records any purchase and work orders it has approved in connection with a 7-A loan within 30 days after approval. Such records must be kept on a building-by-building basis and be accessible to the public. The filings “shall constitute notice to all parties.” Finally, subdivision (b) states that “this limitation shall only apply to transac *473 tions occurring after the date such record should have been entered pursuant to subdivision a and the date such entry was made.”
This appeal turns on how and when a 7-A lien is created and when a purchaser is put on notice of the forthcoming lien. The legislative history is instructive. Prior to 1974, the City filed mechanics’ liens to secure money it spent to repair dangerous conditions in multi-dwelling apartment buildings (see, Administrative Code former § D26-57.03). Under the former statute, the City had no better way to protect its interest. This device, however, proved inadequate because benefitted buildings were often encumbered by considerable debt — to which the City’s interests would have been junior (see, Tr of public hearing before City Council Housing and Buildings Committee, Dec. 17, 1974).
To afford the City greater protection, the City Council enacted section 27-2144, which changed the status of its lien from a mechanic’s lien to a super-priority lien that “shall have a priority over all other liens and encumbrances on the premises except for the lien of taxes and assessment” (see, § 27-2144 [b]; see also, Bagwell, New York City ‘Super Liens,’ NYLJ, Aug. 9, 1999, at SI). Moreover, the enactment takes into account a concern expressed by the title insurance industry over the prospect of liens that would not be revealed in a title search. Responsive to this point, the legislation requires the City to place prospective good-faith purchasers on notice of forthcoming super-priority liens by filing, purchase or work orders in the building-by-building index in HPD’s offices.*
The lien is created when HPD’s expenditures “shall have been definitely computed as a statement of account by [HPD] and [HPD] shall cause to be filed in the office of the city collector an entry of the account stated” (§ 27-2144 [b]). To take priority over liens and encumbrances arising after the issuance of purchase or work orders, HPD must file those purchase and work orders in its own building-by-building index in accordance with section 27-2144 (a). This furnishes notice to prospective purchasers and lenders that public monies have been spent and a lien is forthcoming. If HPD fails to furnish this no *474 tice, the forthcoming lien cannot be enforced retroactively against them provided they took in “good faith” (§ 27-2144 [b]).
In the case before us, the City concededly failed to file any purchase or work orders but claims nonetheless that plaintiff had actual knowledge of 7-A loans and therefore was not a “purchaser in good faith.” The City, however, has failed to raise a triable issue of fact as to plaintiffs actual notice and therefore we need not address whether he would be subject to the lien had he known of the loans. The purpose of the recording requirement of section 27-2144 (a) is to provide a uniform system by which purchasers are given constructive notice of forthcoming 7-A liens which would be given retroactive effect. To render the lien retroactively enforceable, the City need only follow the dictates of the statute. It did not do so here.
Lastly, we share the observation of amicus that the statutory scheme, to put it mildly, “is not a model of clarity.” The writings at the Appellate Division and the widely varying viewpoints of the parties — not to mention the provisions themselves — reveal as much. We respectfully suggest that the appropriate legislative bodies revisit this statutory scheme to clarify its purpose and design.
Accordingly, the order of the Appellate Division should be reversed, with costs, summary judgment on plaintiffs first cause of action granted and the certified question answered in the negative.
Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Graffeo concur.
Order reversed, with costs, plaintiffs motion for summary judgment on his first cause of action discharging the liens of the City of New York granted and certified question answered in the negative.

 Even after the City enacted the present super-lien provision under section 27-2144, article 7-A liens under the RPAPL continued to hold the status of mechanics’ liens. In 1985, 11 years after section 27-2144’s enactment, the State Legislature amended the RPAPL to give 7-A liens “super-priority” status (L 1985, ch 456).